IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| JUANITA ROBINSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 1:08CV391-SRW |
| | ) (WO) |
| MICHAEL J. ASTRUE, Commissioner | ) |
| of Social Security, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OF OPINION**

Plaintiff Juanita Robinson brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a decision by the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits under the Social Security Act. The parties have consented to entry of final judgment by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c). Upon review of the record and briefs submitted by the parties, the court concludes that the decision of the Commissioner is due to be reversed and this action remanded to the Commissioner for further administrative proceedings.

**BACKGROUND**

Plaintiff sought treatment from Dr. Lance Dyess on January 30, 2001 for complaints of back pain and medication refills. Dr. Dyess noted that plaintiff reported that she felt "much better." She weighed 297 pounds and her blood pressure was 150/80.[1] His diagnoses included hypertension, obesity, status-post CVA, osteoarthritis, and proteinuria. He advised

---

[1] Plaintiff's height is 62 inches. (R. 158).

plaintiff to exercise. (R. 174). At her next office visit, plaintiff complained of a cough and shortness of breath. Her blood pressure was 140/84. Dr. Dyess added diagnoses of left otitis media and bronchitis. He advised her to lose weight, increase her fluid intake, and take Tylenol, and he prescribed medications. (R. 173). On May 10, 2001, plaintiff's blood pressure reading was 180/90 and her weight was 304 pounds. Dr. Dyess noted the change in her blood pressure since the previous appointment. He again advised her to lose weight, referred her to a physician at the UAB hypertension clinic and ordered lab testing. He noted her "poor compliance." (R. 172).

Plaintiff returned to Dr. Dyess on September 25, 2001. She weighed 309 pounds and her blood pressure reading was down to 150/88. She complained of pain in her right shoulder. Dr. Dyess diagnosed morbid obesity, hypertension, status-post CVA, proteinuria, osteoarthritis and right shoulder bursitis. He refilled her medications, and referred her for an appointment with a dietician. He recommended that she gradually increase her exercise, and ordered lab testing. (R. 171). At plaintiff's next appointment one month later, her weight had increased to 311 pounds, and her blood pressure was 186/90. She told Dr. Dyess that she was "doing pretty good," and she expressed surprise that her weight and blood pressure were "up." Dr. Dyess noted pedal edema. He changed plaintiff's medication, ordered lab testing, and prescribed a 1200 calorie diet. The following day, plaintiff's blood pressure was 150/96. (R. 169-70).

Plaintiff next returned to Dr. Dyess four months later, on March 4, 2002. Her weight was 310 pounds and her blood pressure was 140/80. Dr. Dyess ordered lab testing. His

diagnoses included labile hypertension, morbid obesity, hyperlipidemia, and status-post CVA. He recommended that plaintiff lose weight and follow a 1200 calorie low salt diet and referred her to a dietician. (R. 168). On April 24, 2002, plaintiff's weight was down to 296 pounds, and her blood pressure was 130/82. She complained of right leg cramps. Dr. Dyess diagnosed transient right buttock and right leg pain and sciatica. He noted that her labile hypertension was "controlled." He again noted plaintiff's diagnoses of obesity, hyperlipidemia and status-post CVA. He recommended that plaintiff lose weight and advised her to increase walking, as tolerated. (R. 167).

Plaintiff did not return to Dr. Dyess for just over a year. In an office visit on May 5, 2003, she weighed 304 pounds and her blood pressure was 170/90. She reported that she was out of her blood pressure medications, that she was not on a diet and that she was not exercising. Dr. Dyess observed pedal edema. He listed diagnoses of labile hypertension, status-post CVA, hyperlipidemia, carotid bruit, and morbid obesity. He noted plaintiff's "total non-compliance" with medications and medical advice. He referred her to other physicians for gynecological examination, mammogram, and eye examination, and referred her for an appointment with a dietician. (R. 166). Two weeks later, on May 19, 2003, plaintiff's blood pressure reading was 210/110. (R. 165). On June 18, 2003, Dr. Dyess noted that plaintiff's hypertension had stabilized. Her blood pressure was 140/90. He diagnosed hypertension -- stabilized, morbid obesity, hyperlipidemia, and carotid bruit. Dr. Dyess and plaintiff discussed gastric bypass surgery, and they spoke about "approach[ing] company for medical disability." (R. 164). Two months later, on August 18, 2003, plaintiff's blood

3

pressure was 140/88, and she weighed 302 pounds. Dr. Dyess again noted pedal edema. Plaintiff reported that she was "doing pretty good." Dr. Dyess advised plaintiff to increase her walking. (R. 163).

On July 2, 2004, plaintiff quit her job as a poultry packer – a job she had held for over twenty-four years – to care for her husband during his final illness. (R. 78, 88, 157). On August 27, 2004, after her husband's death from lung cancer, plaintiff applied for widow's benefits. On the application for widow's benefits, plaintiff indicated that she was not disabled. (R. 78, 153).[2] On April 1, 2005, Fortis Health denied plaintiff's request for reconsideration of its denial of her application for health insurance. The underwriter concluded that plaintiff's coverage was denied appropriately based on information the insurance company had received from Dr. Dyess "pertaining to build, uncontrolled hypertension, carotid bruit, congestive heart failure with last time seen in doctors office being August 2003." (R. 104).

Four months later, in August, 2005, plaintiff filed the present application for disability insurance benefits. When she applied for benefits, plaintiff reported that she "did not know when she became disabled[,]" but that she had last worked on July 2, 2004. She reported that she stopped working because her husband was ill and she had to "see after him." She also stated that she was filing for benefits because she "needed some insurance." (R. 36, 74, 78, 95-97).

On October 15, 2005, Mark Ellis, D.O., performed a consultative physical

---

[2] Plaintiff draws $1003 each month in widow's benefits based on her husband's work history. (R. 20-21).

examination of the plaintiff. Plaintiff weighed 302.8 pounds. Her blood pressure initially was 240/104, but was 212/92 later in the examination. Dr. Ellis noted plaintiff's uncorrected vision as 20/30 in the right eye and 20/400 in the left. Plaintiff told Dr. Ellis that she has problems at times with blurred vision in both eyes. She complained of hypertension and of back pain which had started five to ten years previously. After examining the plaintiff, Dr. Ellis noted that plaintiff had slightly decreased range of motion in her shoulder, elbows, and knees and more markedly decreased range of motion in her hips and dorsolumbar spine. (R. 161-62). He noted that she has some "pretibial edema." Dr. Ellis did not set forth any specific functional limitations, but stated:

> She has some decreased range of motion. In some ways, this appears to be more due to the patient's size than anything else. She is not able to really lie back on the table. Some of this is due to the patient's obesity and size. She does appear to have pain in the lower back with certain movements and on the x-rays. Even though they are under-penetrated, she does appear to have some decrease in the vertebral disc height in the lower lumbar areas.[3]

(R. 157-60). On November 28, 2005, plaintiff reported to J. Walter Jacobs, Ph.D., for a consultative psychological evaluation. Plaintiff stated that Dr. Dyess had prescribed Paxil

---

[3] Earlier in the report, Dr. Ellis explained:

> X-rays were obtained of the patient's lumbosacral spine. These were somewhat poor quality due to the patient not being able to stand up well against the film also due to when trying to do lateral films the patient's hips are very wide and we really can't get the area up against the film. It does appear though on these films that she does have some decrease in the vertebral disc height between L5-S1 as well as between L4-L5. I do not see any fractures or any displacements. Really, no other abnormalities are noted on the plain film x-rays. As mentioned above, these were of poor quality secondary to the patient's size and inability to get these areas specifically up against the films due to adipose tissue build up around the hips and buttocks area.

(R. 160).

to treat her depression, but that she had never seen a mental health professional.  Dr. Jacobs made no diagnosis, stating that he "could not find clinically significant evidence for depression or anxiety."  (R. 155). He added that "[t]here is the possibility that Ms. Robinson's current antidepressant medication is effectively controlling symptoms, but Ms. Robinson did not describe herself as being depressed at present."  (Id.).

Plaintiff returned to Dr. Dyess on June 2, 2006.  Her weight was 289 pounds and her blood pressure was 200/100.  She reported that she needed refills.  Dr. Dyess diagnosed malignant hypertension, obesity, "R/O" subarachnoid hemorrhage, aortic sclerosis, noncompliance with follow up and "?? medication compliance."  (R. 123).  When plaintiff next sought treatment from Dr. Dyess on January 3, 2007, her blood pressure was down to 120/80; her weight was 292 pounds.  (R. 122).  On May 17, 2007, plaintiff's weight had decreased to 282 pounds; her blood pressure was 140/90.  She told Dr. Dyess, "I feel good." On October 8, 2007, plaintiff reported that she felt "fine."  At that visit, Dr. Dyess noted that plaintiff's hypertension was under "good control."  He listed other diagnoses, including obesity, proteinuria, aortic sclerosis, hyperlipidemia, congestive heart failure, hyperthyroidism, and history of remote subarachnoid hemorrhage.  (R. 120-21).

Although it is not clear from the record on what date he examined the plaintiff, Dr. Mitchell v. Purvis, O.D., reported to plaintiff's representative on November 20, 2007 that plaintiff's corrected vision was 20/30 in the left eye, and that she is only able to see "finger counting" in the right.  He diagnosed left extropia, mild cataracts, glaucoma suspect, and "[b]lind left eye, due to old vein occlusion."  (R. 126).

6

On November 7, 2007, after the claim was denied at the initial administrative levels, an ALJ conducted an administrative hearing. The ALJ rendered a decision on February 20, 2008. The ALJ concluded that plaintiff suffered from the severe impairments of hypertension, back pain, obesity, and monocular vision." (R. 12). He found that plaintiff's impairments, considered in combination, did not meet or equal the severity of any of the impairments in the "listings" and, further, that plaintiff retained the residual functional capacity to perform her past relevant work as a poultry packer, as she actually performed that work. Thus, the ALJ concluded that the plaintiff was not disabled within the meaning of the Social Security Act. On April 23, 2008, the Appeals Council denied plaintiff's request for review and, accordingly, the decision of the ALJ became the final decision of the Commissioner.

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed. The court does not reweigh the evidence or substitute its judgment for that of the Commissioner. Rather, the court examines the administrative decision and scrutinizes the record as a whole to determine whether substantial evidence supports the ALJ's factual findings. Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991). Substantial evidence consists of such "relevant evidence as a reasonable person would accept as adequate to support a conclusion." Cornelius, 936 F.2d at 1145. Factual findings that are supported by substantial evidence must be upheld by the court. The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity

attaches to the ALJ's determination of the proper legal standards to be applied. Davis, 985 F.2d at 531. If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed. Cornelius, 936 F.2d at 1145-46.

**DISCUSSION**

Plaintiff argues that the ALJ's residual functional capacity assessment is not supported by substantial evidence because the ALJ relied on the RFC finding of a non-examining DDS consultant who is not a medical doctor which contradicts postural limitations observed by Dr. Ellis during the consultative examination, and because the ALJ failed to obtain a medical source statement from Dr. Ellis. (Plaintiff's brief, pp. 5-8). She further argues that the ALJ erred by failing to provide a narrative discussion describing how the evidentiary record supports the ALJ's conclusion that plaintiff can be "up on her feet for six hours of an eight hour workday in light of her medically severe impairments." (Id., pp. 8-10). Plaintiff's final argument is that the ALJ did not apply the correct legal standard in finding that plaintiff could return to her past relevant work as a poultry packer. She argues, specifically, that the ALJ failed to develop the record adequately regarding the requirements of her past relevant work. Because plaintiff is entitled to reversal on the basis of this final argument, the court does not address the remaining issues.

The ALJ concluded that plaintiff "has the residual functional capacity to perform the full range of light work, except that she cannot perform tasks requiring good binocular vision." (R. 13). He then concluded that she is capable of performing her past relevant work

as a poultry packer – not as it is performed in the national economy,[4] but as she actually performed it. (R. 15). He states, "according to the claimant's own description, she performed no more than light exertional tasks in her past work." (Id., citing R. 74-75).

However, according to plaintiff's description of her work, she was on her feet, standing and walking, stooping and reaching, for the entire 8-hour workday. She reports that she packed chickens – each weighing two and a half to three pounds – into a seventy pound box. (R. 74-75). She states that the "[h]eaviest weight lifted" was "3" pounds, and the amount of weight she frequently lifted was "2 ½" pounds. (R. 75). She explained that she packed the chickens into the seventy pound box and "would slide the box down the belt." (R. 74-75).

Light work, according to the Commissioner's regulations, "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). The term "light work" in the Commissioner's regulations has the "same meaning as [it has] in the exertional classification[] noted in the DOT [Dictionary of Occupational Titles]." SSR 00-4p; see also 20 C.F.R. § 404.1567 ("These terms [sedentary, light, medium, heavy and very heavy] have the same meaning as they have in the *Dictionary of Occupational Titles,* published by the Department of Labor."). The DOT's definition of the exertional levels makes clear that the requirement to use force to move an object by pushing or pulling – not just by lifting – figures into the exertional classification of a job. A job which requires "[e]xerting 20 to 50 pounds of force

---

[4] The VE testified that the work of a poultry processor is "medium and unskilled." (R. 31).

occasionally, and/or 10 to 25 pounds of force frequently" is "medium" work. DOT, Appendix C, Section IV. See also Physical Residual Functional Capacity Assessment form at R. 142 ("Push/and or pull . . . unlimited, *other than as shown for lift and/or carry*")(emphasis added).

During the hearing, other than confirming that plaintiff's "main work" was "in a poultry plant as a packer" (R. 20), the ALJ did not question the plaintiff about her work. (See R. 18-31). His conclusion that her past work was "light" rests entirely on the job description in Section 3 of the Adult Disability Report. (R. 15, ¶ 6 and R. 74-75). However, in light of plaintiff's disclosure that she was required to slide a seventy pound box of chickens down a belt, the adult disability report does not support the ALJ's classification of the work as "light." If plaintiff were required to exert more than twenty pounds of force to slide the seventy pound box only occasionally during her work day, the work would – according to the DOT – be classified as "medium." The record does not provide substantial evidence to support the ALJ's factual finding that plaintiff's past relevant work "does not require the performance of work-related activities precluded by the claimant's residual functional capacity" (Finding No. 6. R. 15) to perform the full range of "light" work which does not require binocular vision.[5]

---

[5] See SSR 82-62 ("The decision as to whether the claimant retains the functional capacity to perform past work which has current relevance has far-reaching implications and must be developed and explained fully in the disability decision. Since this is an important and, in some instances, a controlling issue, every effort must be made to secure evidence that resolves the issue as clearly and explicitly as circumstances permit. Sufficient documentation will be obtained to support the decision. Any case requiring consideration of PRW will contain enough information on past work to permit a decision as to the individual's ability to return to such past work (or to do other work). Adequate documentation of past work includes factual information about those work demands which have a bearing on the medically established limitations.

# CONCLUSION

Upon review of the record as a whole, the court concludes that the decision of the Commissioner is due to be REVERSED, and this action REMANDED for further proceedings consistent with this memorandum opinion.

Done, this 26th day of February, 2010.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE

---

Detailed information about strength, endurance, manipulative ability, mental demands and other job requirements must be obtained as appropriate."); see also 20 C.F.R. § 404.1565(b)("Under certain circumstances, we will ask you about the work you have done in the past. If you cannot give us all of the information we need, we will try, with your permission, to get it from your employer or other person who knows about your work[.]").